# DOCKET NO. 13-10748

## United States Court of Appeals
for the
## Eleventh Circuit

## BETH ADAMS,

*Plaintiff-Appellant,*

v.

## BSI MANAGEMENT SYSTEMS AMERICA, INC.
## and BSI AMERICA PROFESSIONAL SERVICES, INC.

*Defendants-Appellees.*
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION

## BRIEF OF APPELLEES BSI MANAGEMENT SYSTEMS AMERICA, INC. and BSI AMERICA PROFESSIONAL SERVICES, INC.

**TAYLOR ENGLISH DUMA LLP**
Michael Eric Ross
Deborah J. Livesay
1600 Parkwood Circle, Suite 400
Atlanta, Georgia 30339
Telephone:  (770) 434-6868
Facsimile:  (770) 434-7376
mross@taylorenglish.com
dlivesay@taylorenglish.com

*Counsel for Defendants-Appellees*

**DOCKET NO. 13-10748**
**Adams v. BSI Management Systems America, Inc., et al.**

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to 11th Cir. R. 26.1-1, the undersigned counsel of record for Defendants-Appellees BSI Management Systems America, Inc. and BSI America Professional Services, Inc. certifies that the following is a full and complete list of all trial judges, all attorneys, persons, associations of person, firms, partnerships, or corporations (including those related to a party as subsidiary, conglomerate, affiliate, and parent corporation, including any publicly held corporation that owns 10% or more of the stock of a party) that have an interest in the outcome of this particular case or appeal:

Adams, Beth (Plaintiff-Appellant)

Barrett, Benjamin F. (Counsel for Appellant)

Barrett & Farahany, LLP (Law firm representing Appellant)

Brown, Elizabeth L.  (Counsel for Appellant)

BSI America Professional Services, Inc. (Defendant-Appellee)

BSI Ltd. (Parent corporation of Appellees)

BSI Management Systems America, Inc. (Defendant-Appellee)

English, Joseph M. (Counsel for Appellees)

**DOCKET NO. 13-10748**
**Adams v. BSI Management Systems America, Inc., et al.**

Evans, Honorable Orinda D. (Judge, United States District Court, Northern

District of Georgia)

Farahany, Amanda A. (Counsel for Appellant)

Livesay, Deborah J.  (Counsel for Appellees)

Ross, Michael Eric (Counsel for Appellees)

Taylor English Duma LLP (Law firm representing Appellees)


Respectfully submitted this 6th day of May, 2013.

                           *s/ Deborah J. Livesay*
                           Michael Eric Ross
                           Georgia Bar No. 615190
                           Deborah J. Livesay
                           Georgia Bar No. 205591
                           **TAYLOR ENGLISH DUMA LLP**
                           1600 Parkwood Circle, Suite 400
                           Atlanta, Georgia  30339
                           Telephone:  (770) 434-6868
                           Facsimile:  (770) 434-7376
                           E-mail: mross@taylorenglish.com
                           E-mail dlivesay@taylorenglish.com

                           Attorneys for Defendants-Appellees

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Because the factual record is clear, the controlling law is well established, and the District Court correctly analyzed the material facts and properly applied the law to those facts, Defendants-Appellees do not believe that oral argument would assist this Court in deciding the issues on appeal.  Accordingly, Defendants-Appellees do not request oral argument.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE

     DISCLOSURE STATEMENT................................................................ C-1

STATEMENT REGARDING ORAL ARGUMENT........................................ i

TABLE OF CONTENTS....................................................................... ii

TABLE OF CITATIONS....................................................................... v

TABLE OF RECORD REFERENCES...................................................... ix

STATEMENT OF ISSUES.................................................................... 1

STATEMENT OF THE CASE ............................................................... 1

I.   Course of Proceedings and Disposition in the Court Below .................. 1

II.   Statement Of The Facts .............................................................. 2

      A.   BSI's Supply Chain Solutions Group. .......................................... 3

      B.   BSI Selected Adams As SCS Program Manager Due To Her

          Extensive Work And Specialized Expertise In The Supply Chain

          Field............................................................................... 4

          (1)   Adams' Subject Matter Expertise And Work History................. 4

          (2)   The Selection Process For The SCS Program Manager

              Position. ..................................................................... 9

      C.  Adams' Responsibilities As SCS Program Manager. .................. 11

      D.  Adams' Sales And Marketing Role. ...................................... 14

E.  Adams' General Management Duties. .............................................................. 15

III.  Standard Of Review ................................................................................................ 16

SUMMARY OF THE ARGUMENT .............................................................................. 18

ARGUMENT AND CITATIONS OF AUTHORITY ...................................................... 20

I.   The District Court Properly Found That Adams Was Exempt Under
     The FLSA's Administrative Exemption. ............................................................. 21

II.   The District Court Correctly Applied The Standard Of Review And
      Burdens Of Proof. ...................................................................................................... 22

      A.    BSI Satisfied Its Initial Burden Of Demonstrating The Absence
            Of A Genuine Issue Of Material Fact. ......................................................... 23

      B.    Adams Did Not Meet Her Burden Of Creating A Disputed Issue
            Of   Fact. ................................................................................................................ 25

III.   The District Court Correctly Found That Adams Was Exempt Under the
       Administrative Exemption Based Upon the Undisputed Material Evidence
       Establishing The Nature And Scope Of Her Job Duties. .................................. 27

       A.    Adams' Primary Duties Related To BSI's Management And
             General Business Operations. ..................................................................... 32

             (1)   Adams Worked In Functional Areas of BSI's Business. ........... 33

             (2)   Adams Was Not A "Production" Worker. ..................................... 35

iii

B.    Adams Routinely Performed Work Requiring The Exercise Of Discretion And Independent Judgment. ............................................... 38

IV.    This Court Should Affirm Summary Judgment In BSI's Favor Even If It Finds Adams Was Not Exempt Under The Administrative Exemption. ....... 45

A.    Adams Was Exempt Under The Professional Exemption. .................... 45

B.    Adams Was Exempt Under A Combination Of The Administrative And Professional Exemptions. ..................................................................... 51

CONCLUSION ............................................................................................... 52

CERTIFICATE OF COMPLIANCE ............................................................... 53

CERTIFICATE OF SERVICE ......................................................................... 54

# TABLE OF CITATIONS
## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).....................................27, 29

*Barnes v. Southwest Forest Indus., Inc.*, 814 F.2d 607 (11th Cir. 1987) .......... 17, 27

*Brooklyn Sav. Bank v. Neil*, 324 697 (1945).............................................................30

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). ..........................................22, 25, 28

*Christopher v. SmithKline Beecham Corp,* 635 F.3d 383 (9th Cir. 2011) ...............31

*Coppage v. Bradshaw*, 665 F. Supp. 2d 1361 (N. D. Ga. 2009) .... 37, 39, 42, 51, 52

*Ellis v. England* 432 F.3d 1321 (11th Cir. 2005)..........................................17, 26, 43

*Ferrell v. Gwinnett Cnty.  Bd. of Educ.*, 481 F. Supp. 2d 1338 (N.D. Ga. 2007) ...39

*Fitzpatrick v. City of Atlanta*, 2 F.3d 1112 (11th Cir. 1993) ..............................17, 45

*Gottlieb v. Construction Serv. & Consultants*, No. 05-141139

　　　2006 U.S. Dist. LEXIS 97446 (S.D. Fla. July 20, 2006) ....................... 37, 42

*Gregory v. First Title of America, Inc.*, 555 F.3d 1300 (11th Cir. 2009)...........29, 31

*Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913 (11th Cir. 1993) ....................17

*Hogan v. Allstate Ins. Co.*, 361 F.3d 621 (11th Cir. 2004)................... 30, 35, 36, 43

*Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709 (1986).....................................21

*Idaho Sheet Metal Works v. Wirtz*, 383 U.S. 190 (1966) ........................................28

*Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896 (3rd Cir. 1991) ....................35, 36

*Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...29

*Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173 (7th Cir. 1987)............29, 30

*Mize v. Jefferson City Bd. Of Educ.*, 93 F.3d 739 (11th Cir. 1996).........................33

*Nicolson v. World Business Network, Inc.,* 105 F.3d 1361(11th Cir. 1997) ......29, 31

*Porter v. White*, 483 F.3d 1294 (11th Cir. 2007).......................................................17

*Reich v. Cruises Only*, 1997 U.S. Dist. Lexis 23727 (M.D. Fla. 1997) .................30

*Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 9-10 (1st Cir. 1997) .......................36

*Riddle v. Snowbird Corp.,* 1995 U.S. Dist. Lexis 22412 (D. Ut. 1995) ............30, 31

*Rock v. Ray Anthony Int'l, LLC*, 380 F. App'x 875 (11th Cir. Fla. 2010)....28, 31, 41

*Roe-Midgett v. CC Services, Inc.*, 512 F.3d 865 (7th Cir. 2008)..............................35

*Smith v. Johnson & Johnson*, 593 F.3d 280 (3rd Cir. 2010) ....................................36

*Stevens v. Simplexgrinnell, LLP*, 190 F. App'x 768 (11th Cir. 2006)......................40

*Stevins v. Provident Constr. Co.*, 137 F. App'x 198 (11th Cir, 2005)...............46, 51

*Stout v. Smolar*, 2007 U.S. Dist. LEXIS 69615 (N.D. Ga. Sept. 18, 2007) ...........37

*Webster v. Public School Employees of Washington, Inc.*, 247 F.3d 910

    (9th Cir. 2001)...................................................................35

## Statutes

*Fair Labor Standards Act, 29 U.S.C. § 207 *et seq.*.....................................1

29 U.S.C. 207(a)(1)...........................................................28

29 U.S.C. 213........................................................................28

## Court Rules

Fed. R. Civ. P. 1.................................................................29

Fed. R. Civ. P. 56...............................................................25

Fed. R. Civ. P. 56(a) ..........................................................33

Fed. R. Civ. P. 56(c) .....................................................17, 22

## Regulations

29 C.F.R. § 541.200(a)(1)-(3)...........................................31

29 C.F.R. § 541.200(a)(2)..................................................32

29 C.F.R. § 541.200(a)(3)..................................................38

29 C.F.R. § 541.201(a).................................................32, 35

29 C.F.R. § 541.201(b) ......................................................33

29 C.F.R. § 541.201(c)........................................................34

29 C.F.R. § 541.202 ...........................................................39

29 C.F.R. § 541.202(b) ......................................................39

29 C.F.R. § 541.202(c).......................................................................43, 44

29 C.F.R. § 541.202(d) ...........................................................................44

29 C.F.R. § 541.203(b) .......................................................................37, 38

29 C.F.R. § 541.300(a)(1) ........................................................................45

29 C.F.R. § 541.301(a)........................................................................45, 51

29 C.F.R. § 541.700(A) ............................................................................32

29 C.F.R. § 541.708 ..........................................................................51, 52

Preamble, 29 C.F.R. Part 541, 69 Fed.  Reg. 22122, 22143....................39

Preamble, 29 C.F.R. Part 541, 69 Fed. Reg. 22141 (2004) .....................36

## <u>TABLE OF RECORD REFERENCES IN THE BRIEF</u>

| <u>Brief Page #</u> | <u>Record</u> | <u>Docket #</u> |
|---|---|---|
| 1, 16 | Complaint | 1 |
| 2 | Waiver of Service | 3 |
| 2 | Answer | 4 |
| 2 | Amended Complaint | 37 |
| 2 | Answer to Amended Complaint | 38 |
| 2 | BSI's Motion for Summary Judgment | 39 |
| 5-7, 9 | Adams' Linked In Profile | 39-5 |
| 7 | Adams' Consulting Services Agreement | 39-6 |
| 10 | Supply Chain Security Program Manger Job Description | 39-8 |
| 8 | Adams' Curriculum Vitae | 39-9 |
| 10, 14, 19, 24, 40 | Adams' E-mails | 39-11 |
| 10, 14, 33 | Supply Chain Security Manager Roles and Responsibilities | 39-12 |
| 13, 33 | Adams' 2009 Performance Evaluation | 39-16 |
| 10, 14, 33 | Adams' 2010 Performance Evaluation | 39-17 |
| 12, 24, 25 | Adams' Month-End Highlights (Nov. 2009) | 39-21 |
| 12, 25 | Adams' Month-End Highlights (Dec. 2009) | 39-22 |

| 12, 16 | Adams' Month-End Highlights (May 2010) | 39-23 |
|---|---|---|
| 2 | Adams' Motion for Summary Judgment | 40 |
| 26, 42 | Memorandum Of Law In Support Of Plaintiff's Motion For Summary Judgment | 40-1 |
| 4, 12-14, 19, 24, 33, 40 | Plaintiff's Deposition Transcript (Sealed) | 42 |
| 4, 11, 12, 13, 15, 16, 30 | Dan Purtell's Deposition Transcript (Sealed) | 44 |
| 3-16, 19, 24 -26 30, 31, 33-35, 41, 43, 46-51 | Plaintiff's Additional Material Facts And Response To Defendants' Statement Of Undisputed Material Facts To Which There Is No Genuine Issue to Be Tried | 45-2 |
| 2, 19, 21, 22-24, 26, 27, 33, 36, 38, 42-44 | Order Granting BSI's Motion  For Summary Judgment | 55 |
| 2 | Final Judgment | 56 |
| 2 | Notice of Appeal | 57 |

## STATEMENT OF ISSUES

Adams contends that the District Court erred in granting summary judgment in BSI's favor because it incorrectly formulated and/or applied principles of law as they relate to the (1) standard of review, (2) burdens of proof and production, and (3) interpretation of record facts. Adams also contends that the District Court ignored genuine issues of disputed facts central to the determination of the legal issues in this action.

## STATEMENT OF THE CASE[1]

### I.    Course of Proceedings and Disposition in the Court Below

Plaintiff-Appellant Beth Adams ("Adams") filed a one-count complaint on August 30, 2011, alleging that Defendant-Appellee BSI Management Systems America, Inc. ("BSI Management Systems") violated the Fair Labor Standards Act, 29 U.S.C. § 207 *et seq.* ("FLSA" or the "Act") because it allegedly failed to pay her overtime wages. (Dkt. No. 1.) After waiving service, BSI Management Systems timely filed its answer on November 11, 2011, denying Adams' claim

---

[1] The record on appeal is cited according to the number under which an item was docketed in the District Court and the page number(s) of the particular docket entry being cited. The citations will appear as "Dkt. No. __, p. ___." The page numbers refer to the docket page numbers and not, for example, the deposition transcript page numbers. Additional information is given when appropriate. As the District Court did in its Order, when possible, BSI has cited to facts admitted by Adams in *Plaintiff's Additional Material Facts and Response to Defendants' Statement of Undisputed Material Facts To Which There Is No Genuine Issue To Be Tried*, which is Docket No. 45-2.

1

because she had been an exempt employee earning $92,000 per year while employed by BSI Management and was not, therefore, entitled to overtime, assuming she had ever worked any overtime, which BSI Management Services denied. (Dkt. Nos. 3, 4.) After the close of discovery, Adams filed an amended complaint for the purpose of adding BSI America Professional Services, Inc. ("BSI America") as a defendant. (Dkt. No. 37.) (BSI Management Systems and BSI America are referred to collectively as "BSI" or the "Company".) BSI filed its answer denying her amended claims on August 31, 2012, and the parties filed cross-motions for summary judgment the same day. (Dkt. Nos. 38-40.)

On February 12, 2013, the United States District Court for the Northern District of Georgia (Judge Orinda D. Evans) (the "District Court") entered an Order granting BSI's Motion for Summary Judgment, denying Adams' Motion for Summary Judgment, and taxing costs against Adams. (Dkt. No. 55, p. 20.) On the same day, Final Judgment was entered in favor of BSI. (Dkt. No. 56.) Adams filed a Notice of Appeal on February 18, 2013. (Dkt. No. 57.)

## II.    <u>Statement Of The Facts</u>

Despite now claiming that disputed issues of material fact preclude summary judgment, Adams asserted just the opposite in her Motion for Summary Judgment, wherein she stated that "there is no genuine issue as to any material fact." (Dkt. No. 40, p. 1.) Contrary to Adams' position on appeal, the District Court properly

granted summary judgment in BSI's favor, as is demonstrated by the following undisputed, material facts, most of which are based on Adams' own deposition testimony and/or documents she prepared during her employment with BSI.

### A.    BSI's Supply Chain Solutions Group.

Adams began working as the Program Manager for BSI Management Systems' Supply Chain Solutions ("SCS") Group on August 31, 2009.  (Dkt. No. 45-2, p. 15, ¶ 26.)   The SCS Group analyzes the risks of terrorism, cargo disruption, and other threats affecting the global supply chain, and creates solutions to address those threats.  (Dkt. No. 45-2, p. 2, ¶ 2.)

The Company formed BSI America on or about January 1, 2011.  (Dkt. No. 45-2, p. 3, ¶ 4.)  Thereafter, the SCS Group was transferred to BSI America, and Adams continued in the same role she held when the SCS Group was under BSI Management.  (*Id.*)

During her entire tenure with BSI, Adams reported to Dan Purtell ("Purtell"), who has been the Senior Vice President of the SCS Group since April of 2009.  (Dkt. No 45-2, p. 2, ¶ 3.)  Although the SCS Group was based in Athens, Georgia, Purtell only worked in Athens about one week per quarter because he was based out of Arizona and traveled 80-90% of the time.  (Dkt. No. 45-2, p. 43, ¶ 80; pp. 46-47, ¶ 87.)  Therefore, in the summer of 2009, Purtell set out to hire a second-in-command who had extensive subject matter expertise in government

supply chain security programs.  (Dkt. No. 45-2, pp. 21-22, ¶ 41.)

### B.    BSI Selected Adams As SCS Program Manager Due To Her Extensive Work And Specialized Expertise In The Supply Chain Field.

Identifying viable candidates for the SCS Program Manager position was not as easy as simply recruiting individuals with a particular degree.  Neither Adams nor Purtell is aware of any formalized course of study or advanced degree program available in the fields of supply chain security or global trade compliance.  (Dkt. No. 44, p. 16 L21-22; Dkt. No. 45-2, p. 4, ¶ 7.)  However, both agree that there are only about ten people in the world who are subject matter experts in these fields, and that Adams is one of them.  (Dkt. No. 44, p. 17 L5-9, p. 18 L14-2; Dkt. No. 45-2, p. 9, ¶ 8.)  Like Adams, most of the other experts acquired their knowledge and expertise through on-the-job training, independent research and study, and working for academia and government.  (Dkt. No. 42, p. 159 L24 – p. 160 L13; Dkt. No. 45-2, pp. 3-4, ¶ 6.)

(1)    Adams' Subject Matter Expertise And Work History.

Adams developed her expertise in global trade compliance and supply chain security through her extensive personal research and work experience over her 20-plus year career in this field.  (Dkt. No. 45-2, pp. 3-4, ¶ 6; p. 9, ¶ 15.)  She built her knowledge base through extensive independent study, seminars, and webinars and has firsthand experience in all areas of internal supply chain and compliance

through her work for small, medium, and Fortune 500 size enterprises, as well as through managing a university think tank specializing in global trade security research and outreach.  (Dkt. No. 45-2, pp. 3-4, p. 6.)

Adams developed her expertise in supply chain security and global trade compliance primarily while working for Johnson & Johnson.  (Dkt. No. 45-2, pp. 7-8, ¶ 12.)  During her 12-plus year career with Johnson & Johnson, she held various positions, including Transportation Compliance Manager, Team Leader, Transportation Operations, and Transportation Specialist.  (Dkt. No. 39-5, p. 3; Dkt. No. 45-2, p. 8, ¶ 13.)  Johnson & Johnson promoted Adams into the role of Distribution and Compliance Management for International Transportation in October 1997, and she continued in that role until she separated from Johnson & Johnson in December 2000.  (*Id.*)  Johnson & Johnson also entrusted Adams with responsibility for co-spearheading the creation of its very first global transportation compliance program, which involved ensuring "[c]ompliance with global trade regulations, including import compliance, export compliance, dangerous goods compliance, and supply chain security, safety/security compliance."  (Dkt. No. 45-2, p. 9, ¶ 14.)  In fact, Adams was the "go-to" person in this field for Johnson & Johnson, and was recognized as an expert or specialist in this field.  (Dkt. No. 45-2, pp. 9-10, ¶¶ 14, 16.)

After leaving Johnson & Johnson, Adams worked as the Senior Manager of

Distribution and Logistics for Merial Limited from 2000-2001, during which time she was "in charge of warehouse operations, shipping, receiving, import, export, and [] oversaw the staff related to that, and all the other functions that come under that." (Dkt. No. 39-5, p. 3; Dkt. No. 45-2, p. 10, ¶ 17.) Although the term supply chain "safety" was used at that time, Adams' job responsibilities for Merial Limited related to what is now referred to as supply chain security. (Dkt. No. 45-2, pp. 10-11, ¶ 18.) In managing supply chain safety for Merial Limited, Adams was responsible for keeping up with relevant international trade regulations and ensuring that the company had policies and procedures in place to comply with those trade regulations. (*Id.*)

Thereafter, Adams worked as a certified trainer for the State of Georgia's Quickstart program from 2001 until 2004. (Dkt. No. 39-5, p. 3; Dkt. No. 45-2, p. 11, ¶ 19.) As a certified trainer, she provided "training for warehouse technicians to become certified in global distribution and logistics." (*Id.*)

Adams also worked as the Assistant Director for the University of Georgia's Center for International Trade and Security from 2005 until 2007. (Dkt. No. 39-5, p. 3; Dkt. No. 45-2, p. 11, ¶ 20.) All of the work Adams performed in that capacity related to supply chain security. (*Id.*)

In early 2007, Adams left the University of Georgia to start Adams Consulting, LLC ("Adams Consulting"), which specialized in helping companies

6

create "cradle to grave systems" for import and export regulation compliance, dangerous goods compliance, supply chain safety and security, and compliance program establishment.  (Dkt. No. 39-5, p. 2; Dkt. No. 45-2, pp. 11-12, ¶ 21.)  Adams was the sole owner and only paid employee of Adams Consulting and ran the company out of her home.  (Dkt. No. 45-2, p. 12, ¶ 22.)   Although she conferred with a group of friends who provided advice in various areas, Adams "was the one that had that particular compilation of knowledge" and provided the "cradle to grave" expertise related to the services offered by Adams Consulting.  (*Id.*)

On Adams Consulting's website, Adams described her "credentials" as follows:  "Beth Adams has worked within the global marketplace [of import/export logistics, transportation, and compliance] for over two decades.   With her experience and leadership, Beth and her team of experts provide the foundation for Adams Consulting."  (Dkt. No. 45-2, pp. 12-13, ¶ 23.)  In truth, Adams was the only expert on staff for Adams Consulting.  (*Id.*)  For its main client, Adams Consulting designed and guided implementation of a global supply chain compliance program that addressed compliance related to the client's import-export shipping activity, including dangerous goods/hazardous materials, import control, export control, and supply chain security.  (Dkt. No. 39-6; Dkt. No. 45-2, pp. 13-14, ¶ 24.)

7

In late August 2009, Adams stopped actively operating Adams Consulting to accept the SCS Program Manager position with BSI.  (Dkt. No. 45-2, p. 15, ¶ 26.) When applying for the SCS Program Manager position, Adams submitted a copy of her Curriculum Vitae ("CV") to BSI, which she acknowledges accurately described her skills, specialized knowledge, and expertise at the time she applied for the position.  (Dkt. No. 39-9; Dkt. No. 45-2, p. 17, ¶ 31; p. 20, ¶ 37.)  In addition to highlighting Adams' specialized expertise with C-TPAT programs,[2] the CV summarized her skills and experience as follows:

> As a specialist in the import/export community, Beth Adams has focused her career on building company-specific solutions that address the many compliance issued faced by global traders.  Beth served as Assistant Director for the University of Georgia's Center for International Trade and Security, a think-tank for research on export controls.  She also worked with Johnson & Johnson for over a decade, managing and developing global transportation, regulatory compliance, and distribution programs; … Beth … has also worked with a leading animal pharmaceutical manufacturer, managing its international distribution center in Athens, Georgia.  In 2007, Beth branched out on her own to form Adams Consulting – a niche, network-based firm that specializes in helping enterprises of all sizes build and improve their internal import/export compliance programs.

(Dkt. No. 39-9, p. 2; Dkt. No. 45-2, p. 17, ¶ 31.)

In her Linked In profile posted on July 23, 2012, which provided a summary of her prior work history similar to the one in the CV she submitted to BSI, Adams

---

[2] "C-TPAT" stands for U.S. Customs Trade Partnership Against Terrorism.  (Dkt. No. 45-2, pp. 15-16, ¶ 27.)

identified her "Specialties" as "Import/Export compliance, international and national trade regulations, program design and implementation, C-TPAT, PIP, AEO[3] membership, management consulting, staff training, compliance risk evaluation and analysis."  (Dkt. No. 39-5, p. 2; Dkt. No. 45-2, p. 7, ¶ 11.)

(2)    The Selection Process For The SCS Program Manager Position.

The job posting for the SCS Program Manager described the candidate BSI was seeking for the position as follows:

> We are seeking a dynamic Supply Chain Security Program Manager with significant knowledge and experience within government sponsored supply chain security compliance programs including the U.S. Customs Trade Partnership Against Terrorism (C-TPAT), E.U. Authorized Economic Operator (AEO) and Canada's Partners in Protection (PIP) programs.  This position is responsible for assessing, documenting and incorporating multiple country level compliance programs into a single compliance system for international supplier assessments.  The ideal candidate will possess extensive global knowledge of cargo related threats to include terrorism, cargo disruption, cargo theft, transportation modality issues and un-manifested cargo introduction exposures.

(Dkt. No. 45-2, pp. 15-16, ¶ 27.)  The job posting also included the following description of the position's essential responsibilities:

> o    Manages day to day operations and of a web hosted supply chain security risk assessment system.[4]

_____

[3] "PIP" stands for Canada's Partners in Protection program and "AEO" stands for the E.U. Authorized Economic Operator program.  (Dkt. No. 45-2, pp. 15-16, ¶ 27.)

[4] In her brief, Adams correctly points out that the job posting stated that the Program Manager "manages day to day operations **and of** a web hosted supply chain security risk assessment system."  (Adams' Br., p. 11, fn 2.)  Based solely on

  o Assesses and quantifies multiple country level threats/exposures.

  o Creates custom supplier security questionnaires based on country level program compliance needs.

  o Researches data to determine country level threats as it relates to terrorism and the threat against the supply chain and Western targets.

  o Possesses a deep understanding of supply chain security components and the threat(s) associated with international trade.

  o Possesses experience with C-TPAT standards; experience with AEO and PIP a plus.

  o Skilled at Terrorism Analysis.

  o Assess source data and determine the inherent risk within countries where suppliers are located.

(Dkt. No. 39-8, p. 2; Dkt. No. 45-2, p. 16, ¶ 28.)

When posting for the position, BSI indicated that "[t]he qualified candidate must possess a Bachelors Degree in Business, International Studies, or Supply Chain Management." (Dkt. No. 45-2, pp. 16-17, ¶ 29.) Equally as important,

---

her own ipse dixit, Adams asserts that the inclusion of the word "and" was a typographical error. (*Id.*) However, this conclusion is inconsistent with her own assessment of the position, which she described as "tak[ing] the lead in organizing and managing BSI's efforts to get their Supply Chain Security solution up and running" and as "head[ing] [BSI's] new Supply Chain Security Program." (Dkt. No. 39-11, pp. 2-3.) Even if the word "and" was a typographical error, the undisputed record evidence demonstrates that Adams was, in fact, responsible for managing all aspects of this program, including client relationships, vendor relationships, product quality, team performance, programmer oversight, sales support and marketing, and webinar presentations, and that she served as the program's subject matter expert. (Dkt. No. 39-12, p. 3-4; Dkt. No. 45-2, p. 26, ¶ 49; pp. 37-38, ¶ 70; Dkt. No. 39-17, p. 4.) Moreover, even if her primary function was to "manage[] day to day operations **of** a web hosted supply chain security risk assessment system," it still would meet the duty test for the administrative exemption. *See* discussion *infra* at pp. 33-35, 39-41.

however, the Company wanted a candidate with a "[m]inimum of six years experience in a related field: trade compliance, supply chain, security, C-TPAT program management." (*Id.*) Although Adams' bachelor's degree was in Political Science rather than in one of the fields specifically identified in the job posting, she applied for the position because she believed she possessed all of the requisite skills and the level of expertise necessary to perform the job. (Dkt. No. 45-2, p. 17, ¶ 30.)

After an exhaustive nationwide search, BSI agreed that Adams was the best candidate for the job because of her extensive work and specialized expertise in the supply chain field. (Dkt. No. 45-2, p. 22, ¶¶ 42, 43.) Adams accepted BSI's job offer in early August 2009 and negotiated an annual salary of $92,000, which was her compensation for the entire time she was with BSI.[5] (Dkt. No. 45-2, p. 24, ¶ 46.)

### C.    Adams' Responsibilities As SCS Program Manager.

As the District Court correctly found, Adams' day-to-day responsibilities are not genuinely in dispute. Instead, the dispute lies in the characterization of her work and whether it qualifies as exempt under the FLSA. In attempting to

_____

[5] Because Adams' role involved business development, including sales and marketing, BSI initially offered Adams a compensation package that included a lower salary and an incentive bonus tied to sales targets. (Dkt. No. 44, p. 5, L17-24.) However, Adams negotiated a fixed annual salary of $92,000 with no bonus component, which she admitted was intended to cover all of the hours she worked for BSI. (Dkt. No. 45-2, p. 24, ¶ 46.)

downplay her authority and independence, Adams focused on the self-serving generalizations in her deposition testimony and completely ignored her testimony in which, as discussed below, she admits to performing specific tasks and having specific responsibilities that entitled BSI to treat her as an exempt employee. Adams likewise ignored the fact that the conclusory testimony on which she relies is contradicted by various documents that she prepared while working for BSI, which further demonstrate the exempt nature of her job responsibilities.[6]

Adams was initially hired to manage a "solution" called Supplier Compliance Manager ("SCM"), and was responsible for implementing the use of this tool through sales and marketing, overseeing programmers, and consulting with companies once they purchased the solution from BSI. (Dkt. No. 42, p. 93 L6 - p. 94 L24; Dkt. No. 44, p. 13 L4 – p. 15 L17; Dkt. No. 45-2, p. 26, ¶ 48.)

---

[6] For example, Adams prepared various "Month-End Highlights" reports while employed by BSI for the purpose of providing Purtell with a summary of the work she accomplished during the period covered by the reports. (Dkt. Nos. 39-21, 39-22, 39-24; Dkt. No. 45-2, p. 40, ¶ 75.) Adams acknowledged that these reports are an accurate reflection of the work she performed during the particular period covered by each report. (Dkt. No. 45-2, p. 40, ¶75.) These Month-End Highlights demonstrate the broad scope of the exempt work Adams performed for BSI, including, but not limited to, establishing an internship program and hiring its first intern, managing the GRADE project, managing the SCM project, providing marketing and sales support, representing BSI and making presentations at conferences, leading the effort to secure office space for the Athens-based operations, recruiting staff for the Athens office, and facilitating client and vendor meetings. (Dkt. Nos. 39-21, 39-22, 39-23.) A more detailed description of these reports is included *infra* at pp. 24-25, § I(A).

However, Adams did not start working on the SCM solution in earnest until her second year because, shortly after she was hired, BSI was awarded a project from the United States Department of Homeland Security ("Homeland Security") to develop a tool called "GRADE." (Dkt. No. 44, p. 7, L23 – p. 9 L4.) Therefore, BSI put the SCM project on the back burner and Adams assumed responsibility for managing the GRADE project. (Dkt. No. 45-2, pp. 30-31, ¶¶ 56-57.)

Adams testified that she "ran" the GRADE project during her first year with BSI and spent approximately 95% of her time on this project. (Dkt. No. 42, p. 58 L17-25; p. 88 L8-12.) As GRADE's Project Manager, her responsibilities encompassed all aspects of this project, including client relations, vendor relations, product quality, team performance, sales and marketing, and acting as the liaison between the vendor and Homeland Security. (Dkt. No. 45-2, pp. 30-31, ¶¶ 56-57; Dkt. No. 39-16, pp. 2-3.) Adams characterized her role as being responsible for "coming up with the task, activities that needed to take place, tasks that needed to be performed." (Dkt. No. 42, p. 79 L23 – p. 80 L2.) In managing this project, Adams testified that she also had to "make sure that the client's expectations were in line with what [they] were delivering and then put together a project plan with the team but take responsibility for putting together that plan and the timeline and who was going to do what and monitoring [their] progress and putting together reports." (Dkt. No. 42, p. 80 L3-12.) In addition, Adams was responsible for

13

approving invoices and certifying that all work included on an invoice had been performed.  (Dkt. No. 45-2, p. 42, ¶ 78.)

Once GRADE went live in early 2010, Adams shifted her focus back to the SCM project, which she "ran" during her second year.  (Dkt. No. 42, p. 58 L21-22.)  She characterized this role as "taking the lead in organizing and managing BSI's efforts to get their Supply Chain Security solution up and running" and as "head[ing] [BSI's] new Supply Chain Security Program."  (Dkt. No. 42, p. 60 L3 - p. 62 L14; Dkt. No. 39-11, pp. 2-3.)  As SCM Program Manager, Adams was responsible for client relationships, vendor relationships, product quality, team performance, programmer oversight, sales support and marketing, presenting webinars, and serving as the subject matter expert.  (Dkt. No. 39-12, p. 3-4; Dkt. No. 45-2, p. 26, ¶ 49; pp. 37-38, ¶ 70; Dkt. No. 39-17, p. 4.)

D.    Adams' Sales And Marketing Role.

In addition to running the GRADE and SCM projects, Adams was responsible for making sales and marketing presentations in an effort to solicit new business for BSI.  (Dkt. 45-2, p. 37, ¶ 69.)  Because of her technical expertise in the supply chain security field, Adams made sales and marketing presentations at one regional business forum, two or three seminars, and two or three webinars in an effort to generate business for BSI.  (*Id.*)  As a result of one such seminar, Adams successfully secured a contract for a SCM pilot project with Bristol Meyers

14

Squibb after its director of logistics or compliance attended a presentation she made at a forum in New Jersey. (Dkt. No 45-2, p. 35, ¶ 65.) As the project manager, Adams acted as the client and vendor liaison, managed the programmers, and performed substantive work on the content of the project. (*Id.*)

In addition, Adams secured business from Mint Turbines, a prospective client who initially contacted her through Adams Consulting. (Dkt. No 45-2, pp. 34-35, ¶ 64.) Not only was she the primary client liaison while marketing BSI's services, but Adams also performed all of the work once BSI secured the business, which involved preparing an export control compliance program, conducting an executive briefing and discovery meetings, analyzing data, preparing a report with findings and recommendations, and preparing an export control compliance manual. (*Id.*) Adams also secured a contract with SKF, a jewelry manufacturer in New York, to help it implement a counterterrorism certification program with the government, and not only sold the account, but also consulted with SKF in person and completely managed the project. (Dkt. No 45-2, pp. 35-36, ¶ 66.)

### E.    Adams' General Management Duties.

After hiring Adams as the SCS Program Manager, BSI decided to locate the supply chain security team in Athens, Georgia, because Adams represented that the area had pool of relevant talent that she could recruit into the organization. (Dkt. No. 44, p. 56 L1-9.) They then built the team by hiring qualified individuals whom

15

Adams personally knew, recommended, and was instrumental in recruiting. (Dkt. No. 45-2, p. 47, ¶ 88.) In hiring team members for the Athens office, Purtell relied on and accepted Adams' recommendations and made targeted hires of six individuals based exclusively on their professional relationship with and referrals by Adams. (Dkt. No. 45-2, p. 46, ¶ 89.) Adams supervised some of the staff, including interns and four or five staff members assigned to the GRADE project. (Dkt. No. 45-2, pp. 41-42, ¶ 77.) Adams also led the search for the acquisition of office space in Athens, Georgia, and served as the "liaison with [the] leasing agent, SCS team members and BSI management." (Dkt. No. 39-23, p. 2.)

Adams was an at-will employee and BSI terminated Adams' employment on April 18, 2011, because her performance had declined significantly and the Company could no longer rely on her to meet her performance objectives or deadlines. (Dkt. No. 44, p. 222 L6-12; Dkt. No. 45-2, p. 48, ¶ 90.) For instance, she began to repeatedly miss key deliverables and deadlines during the latter part of her employment, and was responsible for BSI losing a contract with a long-time client. (Dkt. No. 44, p. 130 L5 – p. 142 L9.) On August 30, 2011, she filed the instant action claiming BSI violated the FLSA by not paying her overtime. (Dkt. No. 1.)

## III.  __Standard Of Review__

An appellate court reviews a district court's decision to grant summary

judgment *de novo*.  *See Porter v. White*, 483 F.3d 1294, 1302 (11th Cir. 2007).

Rule 56(c) of the Federal Rules of Civil Procedure requires that a district court

enter summary judgment when a moving party demonstrates that there are no

genuine issues of material fact and that it is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).  Because BSI met its burden of showing the absence of any

genuine issue of material fact as to Adams' claims, the burden shifted to Adams

"to establish … that there exist genuine issues of material facts."  *See Hairston v.*

*Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993).  To be genuine,

however, factual issues "must have a real basis in the record. *Id.*  While all

reasonable and justifiable inferences must be drawn in favor of Adams as the party

opposing the motion for summary judgment, the District Court was not required

"to resolve *all* doubts in such a manner."  *See Barnes v. Southwest Forest Indus.,*

*Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (emphasis in original).  Mere conclusory

allegations and/or alleged factual disputes are insufficient to withstand a motion for

summary judgment.  *See Ellis v. England* 432 F.3d 1321, 1325-26 (11th Cir. 2005)

("Mere conclusions and unsupported factual allegations are legally insufficient to

defeat a summary judgment motion.") (citations omitted).

Further, "[w]hen reviewing a grant of summary judgment, the court of

appeals may affirm if there exists any adequate ground for doing so, regardless of

whether it is the one on which the district court relied."  *Fitzpatrick v. City of*

17

*Atlanta*, 2 F.3d 1112, 1117 (11th Cir. 1993).   Here, the District Court properly concluded that no genuine issue of material fact exists after correctly applying summary judgment principles to the facts and evidence in this case.   Based on the undisputed facts, the District Court correctly concluded that Adams was exempt under the FLSA's administrative exemption.   However, even if this Court finds that the District Court's conclusion was improper, it should nevertheless find that summary judgment in BSI's favor was required because Adams was properly classified as exempt under the professional exemption or a combination of the administrative and professional exemptions.   Accordingly, the District Court's decision should be affirmed.

## <u>SUMMARY OF THE ARGUMENT</u>

Adams alleges that BSI violated the FLSA by not paying her overtime, which BSI denies.   Despite herself moving for summary judgment, Adams argues on appeal that genuine of issues of material fact preclude summary judgment in favor of BSI and that the District Court improperly ignored or rejected her version of the facts in granting BSI's Motion for Summary Judgment

Adams' argument is based on her own conclusory deposition testimony and completely ignores the portions of her own deposition and other undisputed record evidence that contradict those conclusions.   Most of Adams' conclusory testimony revolves around the characterization of her job responsibilities while working for

BSI.  For instance, she denies having performed any job duties that related to BSI's business operations or required the exercise of discretion and independent judgment, even though she self-described her work as the SCS Project Manager as 'taking the lead in organizing and managing BSI's efforts to get their Supply Chain Security solution up and running,' and as 'head[ing] their new Supply Chain Security Program.'" (Dkt. No. 55, p. 6; Dkt. No. 42, p. 61 L1 - p. 62 L20; Dkt. No. 39-11, pp. 2-3.)

The District Court found that Adams' conclusory allegations were contrary to the factual record evidence proffered by BSI, which conclusively established the job duties that Adams actually performed.  (*See generally*, Dkt. No. 45-2.) Moreover, because Adams admitted that she did, in fact, perform most of the duties and responsibilities alleged by BSI, the District Court found that no genuine issue of material fact existed.  (*Id.*)  After applying the law to those undisputed material facts, the District Court found that Adams' primary duties related to the management or general business operations of BSI or its customers and that her job duties necessarily required the exercise of discretion and independent judgment. Accordingly, the District Court determined that Adams was exempt from overtime under the FLSA's administrative exemption and properly granted summary judgment in favor of BSI.  This Court should, therefore, affirm the District Court's judgment.

19

Even assuming this Court finds that Adams was not exempt under the administrative exemption, it should nevertheless affirm the grant of summary judgment in BSI's favor because Adams was properly classified as exempt under the professional exemption or a combination of the administrative and professional exemptions.

## ARGUMENT AND CITATIONS OF AUTHORITY

Even though Adams moved for summary judgment on the basis that no material facts were in dispute, she now asserts that genuine disputes preclude summary judgment.   Adams further contends that the District Court erred in granting summary judgment in BSI's favor because it incorrectly formulated and/or applied principles of law as they relate to the (1) standard of review, (2) burdens of proof and production, and (3) interpretation of record facts.

The central theme running throughout these issues is that the District Court purportedly assumed the role of fact finder and improperly ignored or rejected Adams' version of the facts after weighing the credibility of the record evidence. Contrary to this contention, the District Court did not ignore, reject, or weigh the credibility of Adams' version of the facts.  Instead, the District Court found that Adams' "characterization" of her job duties was trumped by her clear and unequivocal testimony and the other undisputed record evidence demonstrating the actual duties and responsibilities she performed while working for the Company.

After applying the law to those undisputed material facts, the District Court found that BSI properly classified Adams as exempt under the administrative exemption of the FLSA. Accordingly, this Court should affirm that decision.

## I.    The District Court Properly Found That Adams Was Exempt Under The FLSA's Administrative Exemption.

Adams asserted that she primarily performed non-exempt duties throughout her employment with BSI and, therefore, BSI violated the FLSA by classifying her as exempt and failing to pay her overtime. The District Court disagreed. After finding no genuine dispute existed as to how Adams spent her work time because she "admit[ted] substantively to the vast majority of [BSI's] facts regarding her day to day activities", the District Court analyzed whether those undisputed activities exempted her from overtime under the administrative exemption, and found that they did. (Dkt. 55, p. 13.) The District Court's decision did not, as Adams contends, violate the summary judgment standard of review because whether an exemption is applicable is a question of law. *See Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986) ("The question of how the respondents spent their working time … is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law….").

**II.    The District Court Correctly Applied The Standard Of Review And Burdens Of Proof.**

Adams contends that the District Court erred in its application of the summary judgment standard of review and burdens of proof.  To the contrary, the District Court merely rejected Adams' attempt to create a disputed issue of fact through her own conclusory allegations and likewise rejected her opinion about the exempt nature of the work she performed for BSI.

As the District Court recognized in its Order, a motion for summary judgment shall be granted when "there is no genuine issue as to any material fact and [] the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  (Dkt. No. 55, p. 11.)  The District Court also correctly noted that once the moving party satisfies its initial burden of demonstrating that no genuine issues of material fact exist, the non-movant must produce "specific facts showing that there is a genuine issue for trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). (Dkt. No. 55, p. 11.)  Here, the District Court properly granted summary judgment in BSI's favor because BSI established that no genuine issues of material fact exist and Adams was unable to refute BSI's contention by showing that material facts were genuinely in dispute.

In arguing that the District Court misapplied the standard of review and burdens of proof, Adams ignores the distinction between the interpretation or characterization of a fact and the fact itself.  For instance, Adams concludes that

"Purtell maintained the tools and means of her employment, and … that she was 'not an independent worker…'" (Adams' Br., p. 26.)  She further characterized the nature of her duties as having had "no authority, no independent discretion, and no power for the exercise of independent judgment as to matters of significance in her employment …."  (*Id.*)    These conclusions and characterizations are legal determinations that are in the purview of the District Court on summary judgment.

Moreover, as discussed below, Adams' conclusions stand in stark contrast to her own deposition testimony and other record evidence about her actual duties and responsibilities.  It is on these undisputed facts that the District Court held that Adams was administratively exempt under the FLSA.  (*See* discussion at pp. 11-16, §§ II(C-E) *supra* for a more thorough discussion of Adams' duties and responsibilities.)

### A.    BSI Satisfied Its Initial Burden Of Demonstrating The Absence Of A Genuine Issue Of Material Fact.

BSI supported its Motion for Summary Judgment with substantive facts demonstrating the actual work Adams performed during her employment, which were supported by Adams' own deposition testimony and written descriptions prepared by Adams during her employment documenting the tasks she performed and responsibilities she assumed for BSI.  For instance, as the District Court noted, Adams "**self-described** her work with BSI as 'taking the lead in organizing and managing BSI's efforts to get their Supply Chain Security solution up and

running,' and as 'head[ing] their new Supply Chain Security Program.'" (Dkt. No. 55, p. 6; Dkt. No. 42, p. 61 L1 - p. 62 L20; Dkt. No. 39-11, pp. 2-3.)  The District Court further noted that Adams "confirmed" taking the lead in "organizing and managing" the Supplier Compliance Manager ("SCM") solution during her second year of employment with BSI.  (*Id.*)  The District Court also found it significant that Adams admitted that she was "responsible" for client relations, vendor relations, product quality, team performance, and sales and marketing for her individual projects.  (Dkt. No. 55, p. 7; Dkt. No. 45-2, pp. 30-33, ¶¶ 56, 57.)

Adams' characterization of her level of authority and independent discretion is also contrary to the work she reported performing in the Month-End Highlights reports that she prepared and submitted on a monthly basis during her employment, which she admitted were an accurate reflection of the work she performed for BSI. (Dkt. No. 45-2, p. 40, ¶ 75.)  For instance, according to one such report, Adams "[a]ssisted marketing with developing an understanding of Supply Chain Security topics, issues, and challenges and BSI opportunities within Healthcare industry." (Dkt. No. 39-21, p. 3.)   She also reported "[s]ecur[ing] $13K global trade compliance consulting opportunity" and "[p]repar[ing] the SOW [statement of work] and redraft[ing] text for consulting agreement."  (*Id.*)  In addition, she reported having her "[f]irst introduction to Board and members of [a client] organization … includ[ing] fostering relationships with [its] leadership, confirming

24

BSI's role and deliverables vis-à-vis Quarterly Reports and Ad Hoc Issue Briefs, and exploring opportunities with offshoot [] member companies and organizations." (*Id.*)

Adams also reported that she "established Supply Chain Solutions internship," "brought on board its first intern," and "[a]ssisted in recruitment of … new technical associate for Advanced Solutions Specialist group." (Dkt. No. 39-22, p. 3.)  She further reported that she "represented BSI at the annual Supply Chain & Logistics Conference and "[h]osted an interactive workshop on best approaches to assessing supplier risk and managing compliance with Trade-Government Supply Chain Security Programs." (*Id.*)

This evidence comes directly from Adams' own deposition testimony and written descriptions of her work.  Not surprisingly, therefore, she admitted almost all of these facts.  (Dkt. No. 45-2.)

### B.    Adams Did Not Meet Her Burden Of Creating A Disputed Issue Of Fact.

Once BSI met its initial burden, Adams had to present factual evidence establishing a material issue of disputed fact to survive summary judgment, which she failed to do.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (Brennen, J. , dissenting) (once a moving party that bears the burden of persuasion at trial satisfies its burden under Fed. R. Civ. P. 56 of showing that no genuine issues of material fact exist, "the burden of production shifts to the party opposing the

motion and requires that party [] to produce evidentiary materials that demonstrate the existence of a 'genuine issue' for trial ....")  Instead, Adams offered her own conclusions and characterizations about her level of authority and independent discretion and judgment, and attempted to portray herself as a mere production worker.  (Dkt. No. 40-1, pp. 15, 18.)  In other words, whereas BSI proffered nonconclusory, factual descriptions of the actual work Adams performed, the vast majority of which she admitted, Adams tried to create an issue of fact just because she supposedly perceived her role as "only a project manager and someone who carried out Mr. Purtell's directions."  (*See generally*, Dkt. No. 45-2; p. 23, ¶ 44.)

The District Court was not required to, and did not, accept Adams' conclusory allegations in the face of undisputed record evidence to the contrary. *See Ellis v. England* 432 F.3d 1321, 1325-26 (11th Cir. 2005).  Thus, as opposed to weighing the credibility of Adams' evidence and rejecting her version of the facts, as she contends, the District Court rejected Adams' characterizations and conclusions about the nature of her work because "the characterization of the work performed, as either exempt or non-exempt, is a legal question for the Court." (Dkt. No. 55, p. 16.)  While the District Court should draw all reasonable and justifiable inferences in favor of Adams as the party opposing the motion for summary judgment (even though she cross-moved for summary judgment), this standard does not require the District Court "to resolve *all* doubts in such a

manner." *Barnes v. Southwest Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (emphasis in original). Moreover, Adams cannot avoid summary judgment by simply advancing characterizations of her work that contradict her own sworn testimony and other unrefuted record evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

Here, the District Court correctly applied summary judgment principles to the facts and evidence in this case and properly concluded that no genuine issue of material fact existed. (Dkt. No. 55, p. 13.) The District Court considered only the Rule 56 evidence properly before it and concluded that Adams failed to raise a triable issue of fact. Because the undisputed record evidence conclusively demonstrated that summary judgment was appropriate as a matter of law, the District Court's decision should be affirmed.

## III.    The District Court Correctly Found That Adams Was Exempt Under the Administrative Exemption Based Upon the Undisputed Material Evidence Establishing The Nature And Scope Of Her Job Duties.

The FLSA generally requires a covered employer to pay each employee overtime compensation for all hours worked in excess of 40 hours in a week "at a rate not less than one and one-half times the regular rate at which he is employed."

29 U.S.C. 207(a)(1).  However, the Act provides a complete exemption from this overtime pay requirement for "any employee employed in a bona fide executive, administrative, or professional capacity . . . ."  29 U.S.C. 213(a)(1).

Although "[t]he employer bears the burden of proving that an employee is exempt from overtime payments," this standard is not as strict and unyielding as Adams has represented to the Court.  *Rock v. Ray Anthony Int'l, LLC*, 380 F.App'x 875, 877 (11th Cir. Fla. 2010) (citations omitted).  Adams asserts that an employer must establish that "*no reasonable mind* could find in favor of the Plaintiff on each and every element of the administrative exemption" and that **"[i]f the record is unclear in any manner** as to an exemption requirement, the employer will be held <u>not</u> to have satisfied its burden."  (Adams Br., pp. 19, 26.) (emphasis in original).  Adams' reliance on *Idaho Sheet Metal Works v. Wirtz*, to support this argument is misplaced as it contains none of the language Adams emphasized in her brief.  383 U.S. 190, 206 (1966).  Nor does it imply the strict standard Adams has suggested.  Instead, it merely reiterates that the employer bears "the burden of establishing the facts requisite to an exemption."  *Id*.

Moreover, even if *Idaho Sheet Metal* could be interpreted to impose such a strict standard, it is no longer controlling as it predates the summary judgment "trilogy," which liberalized the use of summary judgment to dispose of cases before trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) ("Summary

judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action."') (citing Fed. R. Civ. P. 1); *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (if the factual context renders [plaintiffs'] claim implausible ... [plaintiffs] must come forward with more persuasive evidence to support their claim than would otherwise be necessary"); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986) (courts may grant summary judgment when the evidence supporting the plaintiffs claim "is merely colorable or is not significantly probative").

Adams argues that the FLSA's exemption must be narrowly construed and that an "exemption applies only to those employees who fall clearly within its terms and spirit." (Adams Br., p. 26.) While recognizing the need to be "heedful" of the narrow construction requirement, this Court has cautioned that "[t]o read the FLSA blindly, without appreciation for the social goals Congress sought, would do violence to the FLSA's spirit." *Nicolson v. World Business Network, Inc.,* 105 F.3d 1361, 1364 (11th Cir. 1997); *see also Gregory v. First Title of America, Inc.*, 555 F.3d 1300, 1307 (11th Cir. 2009) (while court must construe exemptions narrowly they should do so "without diminishing the spirit of [the] parent legislation); *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1178 (7th Cir.

1987) (narrow construction "generalization" is "at best a tie breaker (and not even that, if some offsetting 'canon of construction' is in play, as normally there will be").

Thus, in determining FLSA coverage, the amount of compensation an employee receives and the degree by which that compensation exceeds the minimum wage can influence a court's decision whether that employee is among those intended by Congress to be entitled to overtime protection.  *See Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1177 (7th Cir. 1987); *Reich v. Cruises Only*, 1997 U.S. Dist. Lexis 23727 at **18-19 (M.D. Fla. 1997).  The FLSA "was designed to 'aid the unprotected, unorganized, and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage."  *Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 625 (11th Cir. 2004) (citing *Brooklyn Sav. Bank v. Neil*, 324 U.S.  697, 707 n. 18 (1945)).  Adams clearly falls outside the class of worker the FLSA was intended to protect as she was able to leverage her specialized knowledge and expertise into an annual salary of $92,000, which she negotiated up from BSI's initial offer of a base salary in the mid-$80,000 range plus an incentive bonus.  (Dkt. No. 44, p. 39 L21 – p. 40 L5; Dkt. No. 45-2, p. 24, ¶ 46.)

Moreover, the Department of Labor's ("DOL") regulations construing the FLSA "must be read and interpreted in light of" all the other regulations.  *Riddle v.*

*Snowbird Corp.,* 1995 U.S. Dist. Lexis 22412 at *13 (D. UT. 1995).  And the "general principle [to construe exemptions narrowly] does not mean that every word [of the statute or implementing regulations] must be given a rigid, formalistic interpretation."  *Christopher v. SmithKline Beecham Corp,* 635 F.3d 383, 397 (9th Cir. 2011).  What is ultimately "decisive is Congressional intent."  *Nicolson*, 105 F.3d at 1365; *accord Gregory*, 555 F.3d at 1307.

The undisputed material facts conclusively establish that Adams clearly and unmistakably falls within the terms and spirit of the administrative exemption. "For the administrative exemption to apply, an employee must (1) earn [a salary of] no less than $ 455 per week, (2) have primary duties that involve 'the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers,' and (3) exercise 'discretion and independent judgment with respect to matters of significance' in performing his primary duties."  *Rock*, 380 F.App'x 875, 877 (11th Cir. 2010) (citing 29 C.F.R. § 541.200(a)(1)-(3)).  Here, Adams negotiated an annual salary of $92,000, which she admits satisfies the first element of the administrative exemption analysis.  (Dkt. No. 45-2, p. 24, ¶ 46; Adams' Br., p. 30.) The undisputed record evidence conclusively shows that the other two criteria are met as well.

31

### A.    Adams' Primary Duties Related To BSI's Management And General Business Operations.

To establish the second prong of the administrative exemption test, BSI must show that Adams' primary duties involved the performance of office or non-manual duties[7] directly related to "the management or general business operations" of BSI or its customers.  29 C.F.R. § 541.200(a)(2).  The FLSA defines "primary duty" as:

> The principal, main, major, or most important duty the employee performs.  Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.  Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(A).  Satisfying this prong requires a showing that Adams "perform[ed] work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a).

---

[7] Adams readily admits that she worked in an office and performed non-manual work.  (Dkt. No. 45-2, p. 25, ¶ 47.)

(1)    Adams Worked In Functional Areas of BSI's Business.

Work directly related to the management or general business operations includes work in functional areas such as, among others, purchasing, advertising, marketing, research, personnel management, public relations, government relations, legal and regulatory compliance, and similar activities.  29 C.F.R. § 541.201(b).  Although Adams tried to create an issue of fact by asserting that a dispute existed as to whether her primary duties related to the SCS Group's management or general business operations, the District Court rejected this contention because it found this dispute had no basis in the record, and therefore was not genuine.  Fed. R. Civ. P. 56(a); *Mize v. Jefferson City Bd. Of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("For factual issues to be considered genuine, they must have a real basis in the record.") (citations omitted).  (Dkt. No. 55, pp. 13-14.)  Indeed, the undisputed record evidence shows that her primary duties did, in fact, relate to the management or general business operations of the SCS Group.

It is undisputed, for example, that Adams was the Project Manager for both SCM and Grade solutions and that her duties included running the projects, providing marketing and sales support, representing BSI and making presentations at conferences, approving invoices for payment, and facilitating client and vendor relationships.  (Dkt. No. 42, p. 58 L17-25; p. 88 L8-12; Dkt. No. 39-12, pp. 3-4; Dkt. No. 39-16, pp. 2-3; Dkt. No. 39-17, p. 4; Dkt. No. 45-2, p. 26, ¶ 49; pp. 30-31,

¶¶ 56-57; pp. 37-38, ¶ 70; p. 40, ¶ 75; p. 42, ¶ 78.)  In addition to managing the technology vendor and interfacing directly with Homeland Security, Adams also supervised four or five employees while managing the GRADE project.  (Dkt. No. 45-2, p. 31, ¶ 57; p. 41, ¶ 77.)  Adams also necessarily devoted significant time to researching and analyzing relevant trends and regulatory changes as she was responsible for drafting trade journal articles, drafting content for technical presentations, conducting webinars, and making substantive presentations at various forums and seminars.  (Dkt. No. 45-2, pp. 28-29, ¶¶ 51-52; p. 46, ¶ 86.)

Further, "[a]n employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers," such as "acting as advisers or consultants to their employer's clients or customers…."  29 C.F.R. § 541.201(c).  It is undisputed that Adams analyzed and developed solutions for BSI's clients, which included advising BSI's customers on government relations, security risks, and legal and regulatory compliance.  (Dkt. No. 45-2, p. 39, ¶¶ 73-74; pp. 42-43, ¶ 79.)  In addition to making sales and marketing presentations in an effort to solicit new business for BSI, Adams personally secured and serviced several smaller clients, which included interfacing with the clients, analyzing their supply chain security and/or compliance needs, and using her specialized expertise to develop programs to fit those needs.  (Dkt.

No. 45-2, pp. 34-36, ¶¶ 64-66, p. 37, ¶ 69.)

(2)    Adams Was Not A "Production" Worker.

Adams asserts that "the ultimate question under this prong is whether an employee is a 'production' rather than 'administrative' worker." (Adams' Br., p. 31.) Her reliance on *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 902 (3rd Cir. 1991) is misplaced, however, as several courts since *Martin* have noted that the production/administrative dichotomy is a vestige of a manufacturing era gone by and has little usefulness in the modern, service based economy. *See, e.g., Roe-Midgett v. CC Services, Inc.*, 512 F.3d 865, 872 (7th Cir. 2008) ("[T]he so-called production/administrative dichotomy--a concept that has an industrial age genesis-- is only useful by analogy in the modern service-industry context… The analogy is not terribly useful here, particularly given that the 2004 regulations suggest a more traditional meaning of 'production.'") (citing 29 C.F.R. § 541.201(a)(2006)).

Similarly, the Ninth Circuit observed that the purpose of the dichotomy was to help in defining what jobs supported general business operations but was never intended "to frustrate the purpose and spirit of the entire exemption." *Webster v. Public School Employees of Washington, Inc.*, 247 F.3d 910, 916 (9th Cir. 2001). Likewise, this Court gave the production/administrative dichotomy a somewhat short shrift and did not attribute to it the same dispositive effect as in *Martin*. *See Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 627 (11th Cir. Fla. 2004). Other courts

35

have observed that *Martin* is outdated, limited to its unique facts and that the low-level nature of the selling activities of the employees in that case was the basis for the Third Circuit's decision. *See Smith v. Johnson & Johnson*, 593 F.3d 280, 285-86 (3rd Cir. 2010); *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 9-10 (1st Cir. 1997). Even more telling is that DOL has clarified that the production/administrative dichotomy is only intended to be one factor that a court examines, if at all, and was never intended to be dispositive. Preamble, 29 C.F.R. Part 541, 69 Fed. Reg. 22141 (2004). As a result, the Third Circuit itself has cast off *Martin* as a vestige of an earlier regulatory era. *Smith,* 593 F.3d at 285-86.

In any event, the District Court expressly rejected Adams' characterization of her duties on the SCM and GRADE projects as "production" rather than "administrative" work. (Dkt. No. 55, p. 16.) Given the undisputed evidence about the specialized nature and scope of Adams' work for BSI and its clients, the District Court likewise rejected Adams' attempt to equate her duties with those of a worker on a manufacturing production line or in retail sales, as Adams duties relate more to the administration of the business than the production of its products. *See, e.g.*, *Hogan*, 361 F.3d at 627 (finding administrative exemption applied; rejecting plaintiffs' contention that they were production workers where they spent the majority of their time servicing existing customers and their duties included, among others, promoting sales, advising customers, adapting policies to

36

customer's needs, and delegating routine matters to staff) (citations omitted); *Coppage v. Bradshaw*, 665 F. Supp. 2d 1361, 1367 (N. D. Ga. 2009) (finding employees generally meet the duties requirement of the administrative exemption if their primary duties involve work such as collecting and analyzing customer information, identifying products to meet customer needs, advising clients about various products, and marketing or promoting the employer's products) (citing 29 C.F.R. § 541.203(b)); *Stout v. Smolar*, 2007 U.S. Dist. LEXIS 69615 (N.D. Ga. Sept. 18, 2007) (finding administrative exemption was applicable because plaintiff's duties went to the general business operations of his law firm employer where he investigated and analyzed accident scenes as part of the preparation of cases for litigation).

Adams' reliance on *Gottlieb v. Construction Serv. & Consultants* also is misplaced because, unlike Adams, Gottlieb had no responsibility for any personnel matters, accounts receivables, account payables, or policy formulation.  No. 05-141139, 2006 U.S. Dist. LEXIS 97446, at *17 (S.D. Fla. July 20, 2006) (finding plaintiff's work was not directly related to management policies or general business operations of his employer or its customers).  Instead, Gottlieb's role was production oriented because his sole responsibility was ensuring that house shells (i.e., foundation, exterior walls, and roof) were built in a timely manner. *Id*. at * 3, 17.

Contrary to Adams' characterization of her role as of one of production, the District Court found her role as a supply chain security consultant and analyst "functionally quite similar" to the duties performed by employees in the financial services field, which the regulations provide as an example of duties that satisfy the "administrative" exemption requirement.   (Dkt. No. 55, pp. 15-16, fn 8.) According to the regulations:

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing, or promoting the employer's financial products.

29 C.F.R. § 541.203(b).  As a matter of law, therefore, the District Court found that the work performed by Adams related to the general business operations of BSI and its customers.  (Dkt. No. 55, p. 16.)

## B.    Adams Routinely Performed Work Requiring The Exercise Of Discretion And Independent Judgment.

The District Court rejected Adams' contention that a genuine dispute existed as to whether she exercised discretion and independent judgment because this contention also had no basis in the record.  (Dkt. No. 55, p. 17.)  To satisfy the third prong of the administrative exemption test, BSI had to present evidence showing that Adams' primary duties involved "the exercise of discretion and

38

independent judgment with respect to matters of significance." *See Coppage v. Bradshaw*, 665 F. Supp. 2d 1361, 1367 (N. D. Ga. 2009) (29 C.F.R. § 541.200(a)(3)). "An employee exercises discretion when he compares and evaluates possible courses of conduct and acts after considering the various possibilities." *Id.* (citing 29 C.F.R. § 541.202). Significantly, the law does not require that an employee operate free from oversight and "[t]he fact that his decision or action is subject to review by management is not dispositive." *Id.*

In analyzing an employee's level of discretion and independent judgment, courts consider a number of factors, including, for example, whether an employee (1) carries out major assignments in conducting the operations of the business; (2) performs work that affects business operations to a substantial degree, even if the employee's assignments are related to the operation of a particular segment of the business; (3) has authority to commit the employer in matters that have significant financial impact; and (4) has authority to negotiate and bind the company on significant matters. *See Ferrell v. Gwinnett Cnty. Bd. of Educ.*, 481 F. Supp. 2d 1338, 1348 (N.D. Ga. 2007) (citing 29 C.F.R. § 541.202(b)). Generally, employees who meet at least two or three of these factors satisfy this requirement. *Id.* (citing Preamble to 29 C.F.R. Part 541, 69 Fed. Reg. 22122, 22143).

Here, the undisputed record evidence shows that Adams performed duties requiring the exercise of discretion and independent judgment on a regular basis.

For example, Adams admitted that she "[took] the lead in organizing and managing [the SCM] project," and "ran" the GRADE project.  (Dkt. No. 42, p. 58 L17-25; p. 61 L1 - p. 62 L20; Dkt. No. 39-11, pp. 2-3.)  Adams characterized her role as the GRADE Project Manager as being responsible for "coming up with the task, activities that needed to take place, tasks that needed to be performed."  (Dkt. No. 42, p. 79 L23 – p. 80 L2.)  She also had to "make sure that the client's expectations were in line with what [they] were delivering and then put together a project plan with the team but take responsibility for putting together that plan and the timeline and who was going to do what and monitoring [their] progress and putting together reports."  (Dkt. No. 42, p. 80 L3-12.)  Her testimony in this regard completely undermines her contention that only Purtell "had responsibility for actually assigning who would do what and how it would work…." (Adams' Br., p. 38) and cannot, therefore, create a genuine issue of disputed fact sufficient to defeat BSI's summary judgment motion.  *See Stevens v. Simplexgrinnell, LLP*, 190 F.App'x 768, 772 (11th Cir. 2006) (granting summary judgment because plaintiff failed to present admissible evidence after court struck plaintiff's affidavit because it contradicted her deposition testimony and she offered no plausible explanation for the contradiction).

Adams' contention that she performed no duties requiring the exercise of discretion or independent judgment is further undercut by her admission that she

managed the intelligence tools/programs, made major decisions regarding systems design, directed subordinates, provided day-to-day management on interpretive analysis, provided feedback and counseling, approved large invoices/purchase orders for payment, and managed and approved the work and all of the personnel involved in the projects for which she was project manager.  (Dkt. No. 45-2, pp. 25-27, ¶¶ 48, 50; pp. 30-45, ¶¶ 56-61, 63-67, 70, 72-78, 83.)  For the clients she marketed to and sold, Adams also was responsible for assessing the market, setting contract prices, drafting content for technical presentations, and servicing those clients.  (Dkt. No. 45-2, pp. 31-33, ¶¶ 57-61; pp. 34-36, ¶¶ 63-66; pp. 38-39, ¶¶ 72-74; p. 42-43, ¶ 79; p. 46, ¶ 86.)

This Court has found that employees exercise the requisite discretion and independent judgment to satisfy the administrative exemption where, as with Adams here, they are responsible for directing and overseeing employees and analyzing customer needs and assigning work to meet those needs.  *See, e.g.*, *Rock v. Ray Anthony Int'l, LLC*, 380 F.App'x 875, 879 (11th Cir. Fla. 2010) (affirming lower court's determination that employee was exempt under the administrative exemption where the employee exercised discretion and independent judgment by assigning employees and equipment for customer jobs, ensuring customer needs were met, and maintaining employee schedules).  Similarly, employees who advise and make recommendations to clients, which Adams routinely did, exercise the

requisite discretion and independent judgment.  *See, e.g.*, *Coppage v. Bradshaw*, 665 F. Supp. 2d 1361, 1368 (N. D. Ga. 2009) (finding plaintiff exercised sufficient discretion and independent judgment to qualify for the administrative exemption where he met with clients and offered individualized recommendations regarding the purchase of his employer's products even though he lacked authority to represent his employer in major disputes, his supervisors screened the candidates he recruited, and he had to regularly meet with upper management to review production goals).

Adams' suggestion that the scope of her duties and responsibilities afforded her no more opportunity to exercise discretion and independent judgment than the limited authority to schedule subcontractors and order supplies afforded the plaintiff in *Gottlieb v. Construction Serv. & Consultants* is unavailing.  No. 05-141139, 2006 U.S. Dist. LEXIS 97446, 17 (S.D. Fla. July 20, 2006).  The record evidence in *Gottlieb* established that the plaintiff's exercise of discretion and independent judgment was truly limited.  *Id.* at * 19.  Here, however, the District Court disagreed with Plaintiff's contention that she had no ability to exercise discretion or independent judgment because she purportedly "solely carried out the marching order of her supervisor, Dan Purtell." (Dkt. No. 40-1, p. 15; Dkt. No. 55, p. 18.)  Although Adams repeatedly asserted that she merely implemented work pursuant to the set parameters defined by Purtell, the District Court noted that she

offered no evidence in the record of these "set parameters." (Dkt. No. 55, p. 18.) Such "unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1325-26 (11th Cir. 2005) (citations omitted). The District Court also observed that the record evidence Adams relied on to support her contention that she "viewed herself … as someone who carried out Mr. Purtell's directions," did not support this position. (Dkt. No. 55, p. 18.) Instead, this evidence supported the opposite conclusion. (Dkt. No. 45-2, p. 23, ¶ 44; pp. 25-27, ¶¶ 48-50.)

Even assuming Purtell assigned Adams all of the duties she performed and provided oversight for her work, his doing so does not change the nature of her work and whether it required the exercise of discretion or independent judgment. 29 C.F.R.§ 541.202(c) ("discretion and independent judgment does not require that the decisions made by an employee have a finality that goes with unlimited authority and complete absence of review."); *Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 627 (11th Cir. 2004) ("[O]versight does not mean that a worker is not required to use discretion and independent judgment) (citations omitted). Adams' contentions otherwise are contrary to the governing regulations, which provide that a consultant acts with discretion and independent judgment when she "has made a study of the operations of a business and … has drawn a proposed change in organization [and has] the plan reviewed or revised by superiors before it is

submitted to the client."  29 C.F.R. § 541.202(c).  Accordingly, the District Court found that Adams' "consulting role for BSI's clients and her research and analysis for the development of GRADE and SCM both involved the exercise of discretion and independent judgment."  (Dkt. No. 55, p. 19.)

Finally, the District Court's conclusion in this regard was not undermined by Adams' argument that she did not act with discretion and independent judgment since other BSI employees performed similar responsibilities.  (*Id.*)  As the District Court noted, her position in this regard is contrary to the applicable regulations.  29 C.F.R. § 541.202(d) ("the fact that many employees perform identical work or work of the same relative importance does not mean that the work of each such employee does not involve the exercise of discretion and independent judgment with respect to matters of significance…")

After applying the law to the undisputed record evidence, the District Court correctly found that Adams was exempt from overtime wages under the FLSA's administrative exemption and granted BSI's motion for summary judgment.  (Dkt. No. 55, p. 19.)  This Court should affirm the District Court's decision because the undisputed record evidence demonstrates that Adams' primary duties involved the performance of office or non-manual work directly related to the management or general business operations of BSI and its clients, and that she routinely exercised discretion and independent judgment with respect to matters of significance.

**IV.  This Court Should Affirm Summary Judgment In BSI's Favor Even If It Finds Adams Was Not Exempt Under The Administrative Exemption.**

Because the District Court found that Adams was exempt under the administrative exemption, it did not consider BSI's other arguments supporting her exempt classification.   Nevertheless, should this Court find the administrative exemption inapplicable, it should affirm summary judgment in BSI's favor because she was exempt under the professional exemption or a combination of the two exemptions, as BSI argued below.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1117 (11th Cir. 1993) ("[w]hen reviewing a grant of summary judgment, the court of appeals may affirm if there exists any adequate ground for doing so, regardless of whether it is the one on which the district court relied.").

**A.    Adams Was Exempt Under The Professional Exemption.**

Adams was properly classified as exempt under the professional exemption while working for BSI.   An employee will qualify as exempt under the professional exemption if she earns a salary of at least $455 per week, and her primary duty is the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction.   29 C.F.R. § 541.300(a)(1); 541.301(a).   However, this Court has recognized that an employee's professional expertise can stem from specialized training and experience, rather than an advanced degree, because "[t]he

FLSA regulations do not require that an exempt professional hold a bachelor's degree; rather, the regulations require that the duties of a professional entail advanced, specialized knowledge." *See, e.g., Stevins v. Provident Constr. Co.*, 137 F.App'x 198, 199 (11th Cir, 2005) (finding construction superintendent was exempt under the professional exemption because he needed advanced, specialized knowledge to perform his duties).

In searching to fill the SCS Program Manager position, BSI sought a candidate with "significant knowledge and experience within government sponsored supply chain security compliance programs including the U.S. Customs Trade Partnership Against Terrorism (C-TPAT), E.U. Authorized Economic Operator (AEO) and Canada's Partners in Protection (PIP) programs." (Dkt. No. 45-2, p. 15, ¶ 15.) The Company needed an individual qualified to assess, document, and incorporate multiple country level compliance programs into a single compliance system for international supplier assessments. (*Id.*) The ideal candidate had to "possess extensive global knowledge of cargo related threats to include terrorism, cargo disruption, cargo theft, transportation modality issues and un-manifested cargo introduction exposures." (Dkt. No. 45-2, p. 16, ¶ 28.)

Although Purtell expected candidates to have a bachelor's degree, and even identified the degrees he thought would be most applicable in the job posting, neither he nor Adams are aware of any **formal** course of study or advanced degree

program available in the fields of supply chain security or global trade compliance. (Dkt. No. 45-2, p. 4, ¶ 7; pp. 16-17, ¶ 29; pp. 21-22, ¶ 41.)  Instead, experts in this field acquire their specialized knowledge or expertise in a variety of ways, including, for example, independent research and study or working for academia or government.  (Dkt. No. 45-2, p. 4, ¶ 7.)  Therefore, Purtell was looking for someone whose credentials included a proven history of working for the government, institutional, academia, or commercial industry in the supply chain security field.  (Dkt. No. 45-2, pp. 21-22, ¶ 41.)

Although Adams' bachelor's degree was in Political Science rather than in one of the fields specifically identified in the job posting, she testified that she possessed all of the requisite skills and the level of expertise necessary to perform the job.  (Dkt. No. 45-2, p. 3, ¶ 5; p. 17, ¶ 30.)  In fact, at the time, Adams considered herself to be an expert and to have specialized expertise in the supply chain security and import/export transportation and compliance fields.  (Dkt. No. 45-2, pp. 5-6, ¶ 9; p. 18 ¶ 34.)  Adams acquired this subject matter expertise through self-education and work experience over the course of her 20-plus year career in this field.  (Dkt. No. 45-2, pp. 3-4, pp. 6-8, ¶¶10-12.)  She built her knowledge base through extensive independent study, seminars, and webinars, and has firsthand experience in all areas of internal supply chain and compliance through her work for small, medium, and Fortune 500 size enterprises, as well as

through managing a university think tank specializing in global trade security research and outreach. (Dkt. No. 45-2, pp. 6-14, ¶¶10-25.) Her expertise was at such a high level that she was qualified to provide leadership to others in this field and ran her own consulting business, which specialized in creating international import/export compliance programs for her clients. (Dkt. No. 45-2, pp. 5-6, ¶ 9; pp. 11-14, ¶¶ 21-25.)

Despite several of the other candidates having one of the degrees identified in the job posting, Purtell selected Adams for the job because of her unique combination of relevant knowledge, skills, and work experience, which gave her instant credibility in the selection process and would bolster BSI's credibility in the marketplace. (Dkt. No. 45-2, pp. 22-23, ¶ 43.) Adams' skill sets and work experience also closely matched the essential responsibilities required of the position. (Dkt. No. 45-2, pp. 15-16, ¶¶ 27-28; pp. 17-21, ¶¶ 31-37, 39-40.) For instance, the SCS Program Manager had to assess and quantify multiple country level threats/exposures, create assessment tools based on country level program compliance needs, research data to determine country level threats as it related to terrorism and the threat against the supply chain and Western targets, and possess a deep understanding of supply chain security components and the threat(s) associated with international trade. (Dkt. No. 45-2, p. 16, ¶ 28.) Adams had extensive experience in these areas, in part, because she had co-spearheaded the

creation of Johnson & Johnson's very first global transportation compliance program, which involved "[c]ompliance with global trade regulations, including import compliance, export compliance, dangerous goods compliance, and supply chain security, safety/security compliance."  (Dkt. No. 45-2, p. 9, ¶ 14.)

BSI also expected the SCS Program Manager to have experience with C-TPAT and preferred that she have experience with AEO and PIP standards.  (Dkt. No. 45-2, 16, ¶ 28.)  In her LinkedIn profile, Adams identified her "Specialties" as "Import/Export compliance, international and national trade regulations, program design and implementation, C-TPAT, PIP, AEO membership, management consulting, staff training, compliance risk evaluation and analysis."  (Dkt. No. 45-2, p. 7, ¶ 11.)

Throughout her employment with BSI, Adams was required to utilize her expertise and specialized knowledge in supply chain security and import/export controls with virtually every project she was involved in and BSI paid her $92,000 per year for these skill sets and expertise.  (Dkt. No. 45-2, p. 24, ¶ 46.)  For instance, Adams created an export control compliance program for one client, which required her to analyze data and prepare a report with findings and recommendations, and to prepare an export control compliance manual.  (Dkt. No. 45-2, pp. 34-35, ¶ 64.)  For another client, Adams implemented a counterterrorism certification program with the government.  (Dkt. No. 45-2, p. 35, ¶ 66.)  Adams

also served as the subject matter expert for the SCM program.  (Dkt. No. 45-2, p. 37, ¶ 70.)  In addition, she analyzed raw data and other information regarding supply chain security incidences and prepared a comprehensive annual report for one of BSI's clients, which not only analyzed the trends regarding cargo theft incidences, but also provided recommendations tailored for the client based on those trends.  (Dkt. No. 45-2, p. 38, ¶ 72.)

Adams also drafted substantive content for a report assessing supply chain security risks for EU member countries and prepared the "Government Effectiveness & Export Control" analysis for 203 countries for inclusion in a Supply Chain Risk Assessment Report for a major global retailer.  (Dkt. No. 45-2, p. 39, ¶¶ 73, 74.)  In addition, Adams drafted the "Export Control System" section for the GRADE project database, which included a detailed assessment of the systems or regulations each country had in place to control the products exported from each country.  (Dkt. No. 45-2, pp. 42-43, ¶ 79.)  Adams relied on her experience and expertise in the field of import/export compliance to analyze the data necessary to prepare the export control report for each country.  (*Id.*)

Based on the specialized knowledge and subject matter expertise required of Adams while she worked as BSI's SCS Program Manager, it is undisputed that she performed work requiring advanced, specialized knowledge in a field of science or learning, which she acquired through extensive self-education and work experience

50

over the course of her 20-year plus career in this field.  Indeed, Purtell is aware of only about ten people in the world who are considered true subject matter experts in the supply chain security field, and he considers Adams to be one of those experts.  (Dkt. No. 45-2, p. 9, ¶ 8.)  Even Adams admits that she has specialized expertise in this field and used that expertise to do her job for BSI.  (Dkt. No. 45-2, pp. 5-7, ¶¶ 9, 11; p. 18. ¶ 34; pp. 27-29, ¶¶ 50, 51, 53; p. 39, ¶ 74, p. 42-43, ¶ 79.)  Adams also admits that she is considered, at least by some, to be an industry expert and that she was comfortable with BSI promoting her as such.  (Dkt. No. 45-2, p. 9, ¶ 8; pp. 29-30, ¶ 54.)   Accordingly, Adams is exempt under the FLSA's professional exemption.  29 C.F.R. § 541.301(a); *Stevins v. Provident Constr. Co.*, 137 F.App'x 198 (11th Cir. 2005) (where employee needed advanced, specialized knowledge to perform his duties, he was exempt under the professional exemption even though a specific advanced degree was not required).

**B.    Adams Was Exempt Under A Combination Of The Administrative And Professional Exemptions.**

"Employees who perform a combination of exempt duties under two or more exemptions may qualify for exemption."  29 C.F.R. § 541.708.  Here, because Adams' duties in managing the day-to-day operations of the Athens office constitute administrative duties, and her work as the supply chain security subject matter expert constitutes professional duties, Adams also qualifies as exempt under the combination exemption.  *See Coppage v. Bradshaw*, 665 F. Supp. 2d 1361,

51

1365 (N.D. Ga. 2009) (an employee may be exempt under the combination exemption of the FLSA) (citing 29 C.F.R. § 541.708).  Thus, even if the Court determines that Adams evenly split her work time for BSI performing administrative and professional duties, she still qualifies as exempt under the combination exemption.  29 C.F.R. § 541.708 ("[F]or example, an employee whose primary duty involves a combination of exempt administrative and exempt executive may qualify for exemption.  In other words, work that is exempt under one section of this part will not defeat the exemption under any other section.")

## CONCLUSION

For the foregoing reasons, BSI respectfully requests that this Court affirm the District Court's Judgment and underlying Order granting summary judgment in BSI's favor.

Respectfully submitted this 6th day of May, 2013.

> *s/ Deborah J. Livesay*
> Michael Eric Ross
> Georgia Bar No. 615190
> Deborah J. Livesay
> Georgia Bar No. 205591
> **TAYLOR ENGLISH DUMA LLP**
> 1600 Parkwood Circle, Suite 400
> Atlanta, Georgia  30339
> Telephone:  (770) 434-6868
> Facsimile:  (770) 434-7376
> E-mail: mross@taylorenglish.com
> E-mail dlivesay@taylorenglish.com
>
> Attorneys for Defendants-Appellees

52

## <u>CERTIFICATE OF COMPLIANCE</u>

**I HEREBY CERTIFY** that the foregoing Brief of Appellees complies with:

(1)    The type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because it contains 12,638 words (according to the word-count function of the word-processing program used to prepare this brief), excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

(2)    The typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of  Fed.R.App.P. 32(a)(6) because it has been prepared in 14-point proportionately spaced typeface using Microsoft Word 2007, the Times New Roman type style.

*s/ Deborah J. Livesay*
Deborah J. Livesay
Ga. Bar No. 205591

53

## IN THE UNITED STATES COURT OF APPEALS
## FIR THE ELEVENTH CIRCUIT

BETH ADAMS,                               )
                                          )
    *Plaintiff-Appellant,*          )          Docket No.  13-10748
                                          )
        vs.                       )
                                          )
BSI MANAGEMENT SYSTEMS                    )
AMERICA, INC.,  and BSI AMERICA           )
PROFESSIONAL SERVICES, INC.   ,           )
                                          )
    *Defendants-Appellees.*         )
_____       )

## CERTIFICATE OF SERVICE

This is to certify that on this day the foregoing **Brief Of Appellees BSI Management Systems America, Inc. And BSI America Professional Services, Inc.** was electronically filed with the Clerk of Court using the CM/ECF system, which sent notification of such filing to counsel of record.  In addition, a copy of the foregoing was served on the following counsel of record via U.S. Mail with proper postage attached thereto:

> Benjamin F. Barrett
> Elizabeth L. Brown
> BARRETT & FARAHANY, LLP
> 1100 Peachtree Street, Suite 500
> Atlanta, Georgia 30309

This 6th day of May, 2013.

> *s/ Deborah J. Livesay*
> Deborah J. Livesay
> Ga. Bar No. 205591

54